UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| TORIE R. POWELL, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:10-cv-0093 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

To:   The Honorable John T. Nixon, Senior Judge

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI), as provided under Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 12, 13, 14). The Magistrate Judge has also reviewed the administrative record and supplements (hereinafter "Tr."). (Docket Entry 10). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence four.

## I. INTRODUCTION

Plaintiff first filed for Social Security Income ("SSI") and Disability Insurance Benefits ("DIB")[1] on March 14, 2007. (Tr. 100-09). Plaintiff's claim was denied initially and on

---

[1] Plaintiff has not appealed the DIB denial.

1

reconsideration. (Tr. 58-60, 63-64). She requested a hearing before the ALJ, which was held on July 9, 2009 before ALJ Douglas Kile. (Tr. 25-48). The ALJ issued an unfavorable decision on September 29, 2009. (Tr. 12-24).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since February 21, 2007, the application date. (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: bipolar disorder; substance addiction disorder; obesity; back problems; borderline intellectual functioning; and depression. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except preclude her from any such work requiring frequent bending and stooping, frequent squatting, frequent contact with the public, and more than simple instructions.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on March 23, 1980 and was 26 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 21, 2007, the date the application was filed (20 CFR 416.920(g)).

The Appeals Council denied Plaintiff's request for review on July 26, 2010. (Tr. 1-5).

This action was timely filed on September 23, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on March 23, 1980. (Tr. 27). She has a ninth-grade education and never obtained a General Equivalency Diploma ("GED"). (Tr. 27-28). She first applied for SSI on March 14, 2007 with an alleged disability onset date of January 13, 2006. (Tr. 100-02).

Plaintiff was admitted to First Step of Sarasota, Inc. for the Mothers and Infants treatment program on April 7, 2003 and discharged on June 13, 2003. (Tr. 188). Plaintiff was admitted because she was pregnant and using cocaine. (Tr. 189). Plaintiff's comprehensive psychosocial assessment notes that she had abused alcohol, cocaine, and crack in the past. (Tr. 192). She was homeless and was a previous victim of domestic violence. *Id*. She showed a desire for treatment. *Id*. Her counselor recommended a residential treatment program for a period of 6-12 months. (Tr. 193).

Dr. William Crockett saw Plaintiff for a psychiatric evaluation on April 15, 2003. (Tr. 196). He diagnosed her with cocaine dependency, mild to moderate depression, dysthymia, and PTSD. (Tr. 198). He prescribed a low dose of Zoloft. *Id*. On May 20, 2003, he increased Plaintiff's Zoloft prescription and prescribed a low dose Risperdal. (Tr. 196).

Plaintiff did not complete the program at First Step and left against medical advice on an absent without leave status. (Tr. 190). Plaintiff's counselor did not believe her prognosis for recovery from her addiction was good, as she displayed extreme co-dependency on her boyfriend and seemed more concerned with him than her need for treatment. (Tr. 190).

On January 12, 2004, Plaintiff was referred by the Department of Children and Families ("DCF") to Mid Florida Medical Services. (Tr. 228-34). At her intake, Plaintiff stated she had a treatment plan with DCF requiring therapy, as her boyfriend had reported her to DCF for taking

drugs while pregnant. (Tr. 228). Plaintiff noted she had been treated for depression in the past. (Tr. 230). Plaintiff's counselor diagnosed her with severe major depressive disorder. (Tr. 232). She assessed Plaintiff's Global Assessment of Functioning ("GAF") as 45.[2] (Tr. 233). Plaintiff was also diagnosed with cocaine abuse. (Tr. 225). Plaintiff complaint of uncontrollable shakiness as a result of Geodon. (Tr. 214). On June 24, 2004, Plaintiff was discharged from treatment due to non-compliance with medication and counseling. (Tr. 209).

Beginning on July 9, 2004, Plaintiff was treated at Plateau Mental Health Center. (Tr. 287-360). At her intake assessment, Plaintiff stated she had been clean for about 1 month after having a relapse using methamphetamine. (Tr. 356-57). She stated she suffered from depression, paranoia, anxiety, poor sleep, and poor appetite. (Tr. 356). Plaintiff had not been taking her prescribed medication for approximately three months. *Id*. Dr. Dominguez prescribed medication, including Zoloft. (Tr. 360). Plaintiff cancelled or did not show for her appointments on August 6, August 16, and September 13. (Tr. 354-55). Plaintiff did show for her appointment on November 1, 2004, and she was prescribed Zoloft, Depakote, and Seroquel. (Tr. 353). At Plaintiff's November 22, 2004 appointment, her GAF was noted as 50. (Tr. 350). After not showing for several appointments, Plaintiff was discharged from Volunteer Health Care System

---

[2] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

4

on May 25, 2005. (Tr. 344).

On December 14, 2005, Plaintiff apparently began treatment at Plateau Mental Health Center again. (Tr. 343). She cancelled that appointment, however, because she wanted therapy in Cookeville. *Id*. She did not show for several appointments, attending her first one on March 3, 2006. (Tr. 341-43).

On December 22, 2005, Jeffery Scott Herman, M.A., Senior Psychological Examiner, conducted a consultative psychological evaluation on Plaintiff. (Tr. 235-43). Mr. Herman noted Plaintiff had missed a previous appointment because she "couldn't get up that day." (Tr. 238). Plaintiff stated she has difficultly sleeping but when she falls asleep often sleeps 14 hours. (Tr. 239). Plaintiff has never been in a psychiatric hospital. *Id*. Medication and psychotherapy were helpful to her. *Id*. At the time of the examination, she was receiving therapy at Personal Growth and Learning Center and was scheduled to begin therapy at Plateau Mental Health Center. *Id*. Plaintiff stated drinking has never been a problem for her, but she used crack cocaine at age 23. (Tr. 239-40). She has not used crack cocaine since 2003. (Tr. 240). Plaintiff used methamphetamine from May to September 2004. *Id*. She denied any other drug use. *Id*.

Plaintiff stated she gets up between 11 am and 1 pm and sits on the couch to watch television. (Tr. 240). Her one housekeeping chore is doing dishes every day. *Id*. She rarely leaves the house and does not do very much. *Id*. She does no cooking, laundry, or cleaning. *Id*. She does not go grocery shopping or do yard work. *Id*. She tries to go to sleep around 10 pm but often lays awake until midnight. *Id*. On bad days, she typically does not leave her bedroom. *Id*.

Mr. Herman noted Plaintiff's short term memory is intact. (Tr. 240). Her judgment is also intact. (Tr. 241). Plaintiff does not have a history of hallucinations except those associated with drug use. *Id*. Plaintiff has no friends. *Id*. She was able to perform fairly advanced

5

arithmetic mentally. *Id*. She had no abnormalities in speech or thought content or process during the evaluation, and she reported no homicidal or suicidal ideation. *Id*. Mr. Herman stated Plaintiff has a history of bipolar disorder, with some relief taking Seroquel for her symptoms. (Tr. 241). He opined Plaintiff was limiting her activities beyond what is considered normal and overreacts in normal situations. (Tr. 242). He believed she might suffer from Avoidant Personality Disorder. *Id*.

Plaintiff attended an appointment at Plateau Mental Health Center on March 3, 2006. (Tr. 336-41). She had not taken her medications for approximately 9 months. (Tr. 336). She was given prescriptions for Zoloft and Seroquel. (Tr. 341). On March 31, 2006, her GAF score was noted to be 50. (Tr. 335). Plaintiff also reported sleeping much better on that date. (Tr. 334). Plaintiff was discharged due to a provider decision on August 24, 2006. (Tr. 332).

Plaintiff next saw a therapist for an initial intake at Plateau Mental Health Center on October 10, 2006. (Tr. 314-30). She kept the following appointment, on October 19, 2006. (Tr. 331). She cancelled or did not show for any appointments until December 8, 2006. (Tr. 311-13). On that date, she reported she was "doing ok," but her moods were "the same." (Tr. 308). She stated she became frustrated in public. *Id*.

Plaintiff again cancelled or did not show for appointments until February 13, 2007. (Tr. 306-07). On February 13, Plaintiff reported she had cut herself approximately 2 to 3 weeks prior to the appointment. (Tr. 306). She had been without Lamictal and Seroquel for approximately 1 week. (Tr. 303). Plaintiff also stated she had been isolating herself. *Id*. Plaintiff reported only having side-effects, including headaches, nausea, and vomiting, when not taking her medications. *Id*. Plaintiff attended appointments on February 26, March 26, April 16, and May 7. (Tr. 293-302). She was noted as responding well to treatment. (Tr. 295, 302). On May 7, her GAF score

was reported as 49. (Tr. 294). On May 14, 2007, Plaintiff cancelled her appointment, reporting she was not having a problem at that time. (Tr. 292). She cancelled additional appointments through July 25, 2007. (Tr. 289-92).

On June 25, 2007, Mark Loftis, M.A., SPE performed a consultative examination on Plaintiff. (Tr. 254-59). Plaintiff reported she was seeing Holly Robertson at the local mental health center in Cookeville and was taking Cephalexin, Lamictal and Seroquel. (Tr. 255). Plaintiff stated she goes to bed sometime between 9:00 p.m. and 3:00 a.m. and gets up at 10:00 to 11:00 the next day. (Tr. 256). She does not drive because she does not have a valid driver's license. *Id*. Her boyfriend takes care of the finances. *Id*. She helps with the dishes and some household chores and goes to the grocery store once per month. *Id*.

Mr. Loftis measured Plaintiff's Verbal IQ as 82, her Performance IQ as 72, and her Full Scale IQ as 75, placing her in the borderline range of intellectual functioning. (Tr. 256-57). He believed this to be an accurate assessment of her current level of functioning. (Tr. 257). He believed she may have a learning disability in arithmetic. *Id*. However, he believed part of the measures may be a result of educational deprivation rather than actual ability. *Id*.

Mr. Loftis noted Plaintiff was not suicidal or homicidal and had no evidence of psychosis or delusional thinking. (Tr. 257). He stated she appears to have a significant history of bipolar disorder and has had problems with sleep. (Tr. 257). He diagnosed her with Bipolar disorder, history of cocaine dependence, and possible personality disorders. (Tr. 258). He believed she was capable of learning and could probably learn simple tasks with sufficient recall. *Id*. Her bipolar disorder was fairly well managed, but she did tend to decompensate from time to time. *Id*. He believed this would cause a moderate impairment in her ability to deal with work related stressors and the work environment, and she might have some problems with consistency of

7

performance. *Id*. He noted she presently appears to have a moderate impairment in her ability to deal with typical work situations. *Id*.

Timothy Fisher, D.O., examined Plaintiff on July 2, 2007. (Tr. 261-64). Dr. Fisher concluded Plaintiff had no physical problems that should preclude her from performing jobs which would require standing and/or walking 6 to 8 hours daily, lifting objects weight up to 15 pounds frequently and objects weighing up to 40 pounds occasionally. (Tr. 264). He believed a psychological consultation was advisable. *Id*.

Frances Breslin, Ph.D., completed a psychiatric medical records review on July 21, 2007. (Tr. 265-78). Dr. Breslin concluded Plaintiff could perform simple routine tasks with little social interaction. (Tr. 277). She completed a Mental Residual Functional Capacity Assessment on the same date, noting Plaintiff was moderately limited in her abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule and maintain regular attendance and be punctual, to work in coordination with or proximity to others without being distracted, to complete a normal workday and workweek without interruptions and to perform at a consistent pace, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriate to changes in the work setting, and to set realistic goals or make plans independently of others. (Tr. 283-84). She stated Plaintiff was markedly limited in her ability to interact appropriately with the general public. (Tr. 284). She believed Plaintiff would benefit from casual supervision and occasional dress and grooming prompts. (Tr. 285). Plaintiff could, in Dr. Breslin's opinion, maintain an acceptable work schedule. *Id*.

William Downey, M.D. performed a consultative examination of Plaintiff's medical records on July 23, 2007. (Tr. 279-82). He concluded her pyschical impairments were not severe, singly or combined. (Tr. 279). He stated she had alleged uncontrollable shaking of the hands and face, but these were not noted by the consultant who examined her. (Tr. 282).

On September 12, 2007, Lloyd A. Walwyn, M.D., performed a consultative physical on Plaintiff. (Tr. 361). He noted there was no worsening of her physical condition, no new physical condition alleged, and no new medical records regarding her physical allegations. *Id*. He adopted the physical RFC from Plaintiff's initial consultative exam. *Id*.

On November 14, 2007, Andrew J. Phay, Ph.D., reviewed Plaintiff's psychiatric records. (Tr. 362-75). He concluded she had mild restriction of activities of daily living; moderate difficulties in maintaining social function; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 372). On his Mental Residual Functional Capacity Assessment, Dr. Phay concluded Plaintiff had moderately limited abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule and maintain regular attendance and be punctual, to complete a normal workday and workweek without interruptions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them, and to set realistic goals or make plans independently of others. (Tr. 376-77). He noted Plaintiff appears likely to have some but not substantial difficulty to set and pursue realistic work goals in the work setting. (Tr. 378). She could understand and perform simple and low level detailed tasks. *Id*.

At her hearing, Plaintiff testified that she wanted to go to school but was incapable of going, because she has a hard time getting out of bed. (Tr. 28). She does not have physical

9

impairments other than low back pain, but she has severe mood swings and has a hard time making it from day to day. *Id*. She currently takes Abilify and Doxepin. *Id*. Those drugs cause her to shake uncontrollably at times, insomnia, and anxiety. (Tr. 29). She has mood swings with violent tendencies, where she yells, screams, and cries. *Id*. She has also hit and thrown things at her boyfriend. (Tr. 33-34).

Plaintiff is 5 feet 8 inches tall and weighed 200 pounds at the time of the hearing. (Tr. 39). Her weight fluctuates about ten pounds on a regular basis. *Id*. She smokes approximately one pack of cigarettes every day and a half.[3] *Id*. Her smoking has increased since her onset date, January 13, 2006. *Id*.

Plaintiff had not seen a mental health provider for approximately six months prior to her hearing. (Tr. 30). She could not get transportation to the facility she was going to, and her provider would not switch Plaintiff to a closer treatment facility. *Id*. Plaintiff is now assigned to a new facility about 25 miles from her home and has transportation from family members who drive that direction regularly. *Id* Her first appointment was scheduled for October 30. (Tr. 31).

Plaintiff testified that she had problems with drugs in the past. (Tr. 31). She had a cocaine habit in approximately 2001 and 2002. *Id*. She has not used cocaine at all since 2002, and she never drank alcohol. *Id*. She occasionally smoked marijuana as recently as January or February when she suffered from insomnia due to her medications. (Tr. 32).

Plaintiff stated she has insomnia due to her bi-polar disorder. (Tr. 33). She stays awake for days at a time. *Id*. She takes Tylenol PM to help her sleep, and she sleeps anywhere from

---

[3] Plaintiff's testimony is not entirely clear on this point. She first states she smokes about a "pack every day and a half" but then indicates her consumption has gone up from approximately one pack every three to four days to "about a pack and a half." (Tr. 39).

10

eight to fourteen hours per night. *Id*.

Plaintiff testified that she is suicidal on a regular basis. (Tr. 34). She last tried to commit suicide in 2002 or 2003. *Id*. When she is suicidal, her family members talk her through it. *Id*. While she has considered turning herself into a mental hospital, she has not done so. *Id*.

From the time she was 14 until 2003, Plaintiff tried to work. (Tr. 34). She has worked in fast food, house cleaning, and dry cleaners. (Tr. 35). She was unable to work at the dry cleaners because she has a hard time dealing with people and authority figures. *Id*. She was unable to work at other jobs because she has problems at times dealing with anything other than what is going on with her and her mood changes. *Id*. Her last job was in 2003 at Wal-Mart in Sparta. (Tr. 36). She was assigned to the shoe department and left after two hours of work because they had scheduled her to work a 10-hour shift when she was supposed to be part-time. *Id*.

Since leaving Wal-Mart, Plaintiff has not tried to work. (Tr. 37). Her family has helped to support her since her alleged disability onset date. *Id.* She receives approximately $300 in food stamps monthly. (Tr. 38). Plaintiff lives with her boyfriend, his father, his brother, and his brother's girlfriend, Plaintiff's cousin. (Tr. 40). Plaintiff and her boyfriend live outside the actual house in a camper. *Id*. Plaintiff has four children, ranging in age from 6 to 10, but none of them lives with her. *Id*. Plaintiff's boyfriend is unemployed and receives unemployment benefits. (Tr. 41).

Plaintiff is unable to drive because her license was suspended. (Tr. 38). She did not pay a speeding ticket in Florida in 2001. *Id*. Her boyfriend used his father's car to transport her to the hearing. (Tr. 39).

The Vocational Expert ("VE"), Anne Thomas, testified that Plaintiff's past relevant work was mostly light, unskilled work. (Tr. 41-42). The ALJ asked her to assume that he found

11

Plaintiff capable of light work but with non-exertional impairments that result in an inability to handle frequent contact with the general public; an inability to learn, understand and carry out more than simple job instructions; an inability to perform frequent bending and stooping; and an inability to perform frequent squatting. (Tr. 42). Ms. Thomas testified that an individual with Plaintiff's education and experience and those limitations could work as a production assembler (1,100 jobs in Tennessee, 470,000 in the U.S.), production inspector (3,700 jobs in Tennessee, 210,000 in the U.S.), or hand packer (1,000 jobs in Tennessee, 200,000 in the U.S.). *Id.*

The ALJ next asked Ms. Thomas to assume the same limitations but at a sedentary level. (Tr. 42-43). Ms. Thomas stated that Plaintiff could perform jobs at a sedentary level, including as a production assembler (2,200 jobs in Tennessee, 156,000 in the U.S.), small products inspector (600 jobs in Tennessee, 42,000 in the U.S.), or production laborer (1,900 jobs in Tennessee, 70,000 in the U.S.). (Tr. 43). When asked, Ms. Thomas testified that additional restrictions of an inability to work at heights and around moving and dangerous machinery would not have an effect on the numbers previously set forth. *Id*. Finding Plaintiff suffers from pain ranging from a moderate to moderately severe degree would not change Ms. Thomas's testimony. (Tr. 44). Severe pain would eliminate work. *Id*. A finding Plaintiff suffers from fatigue lesser than a severe degree would similarly not impact Ms. Thomas's analysis, although severe fatigue would eliminate work. (Tr. 44-45).

Ms. Thomas testified that an employer will normally allow no more than one or two absences a month, and if Plaintiff was required to be absent more than two days per month due to her impairments, she would be unable to maintain employment. (Tr. 43). She further stated that there are generally two 15 minute breaks and a lunch period lasting from 30 minutes to one hour. *Id*. If Plaintiff was required to lie down or absence herself from the work station for periods of

time outside normal breaks, she would not be employable. (Tr. 43-44).

Ms. Thomas stated Plaintiff could not return to any of her prior jobs, because her past relevant work included working with the public. (Tr. 44). The ALJ asked Ms. Thomas whether a finding Plaintiff has been restricted to the full extent alleged in her testimony would eliminate work. (Tr. 45). Ms. Thomas stated that Plaintiff would not be able to work, because she testified she could not complete an eight hour work day and was unable to attend and concentrate or behave in an emotionally stable manner at any time. *Id*.

Plaintiff's attorney asked Ms. Thomas whether a moderate impairment in Plaintiff's ability to deal with work related stresses would impact her ability to work. (Tr. 45-46). Ms. Thomas did not answer the question because Plaintiff's attorney did not define what moderate impairment would mean. (Tr. 46).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff presents three alleged errors for review. First, the ALJ failed to consider the opinions of Dr. William Crockett, Plaintiff's treating physician. Second, the ALJ's determination that there is a significant number of jobs that Plaintiff can perform is not supported by substantial evidence. Third, Plaintiff cannot work on a continuing and sustaining basis. Because the Magistrate Judge believes this action should be remanded based on the first alleged error, the second and third errors have not been addressed in this Report and Recommendation.

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.      If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.      If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.      If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

|   | a listing is met or equaled, benefits are owing without further inquiry. |
|---|---|
| 4. | If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability. |
| 5. | Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity. |

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

D.   <u>The ALJ Failed to Consider the Opinions of Dr. William Crockett</u>

Plaintiff objects to the ALJ's failure to defer to the opinion of Dr. Crockett that Plaintiff suffered from PTSD. An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

15

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

Here, the ALJ offers no indication that he considered the psychiatric evaluation performed by Dr. Crockett or any of the records from First Step. (Tr. 188-96). His only citation to the First Step records is in stating Plaintiff had used illicit drugs and attended rehabilitation. (Tr. 17, 21). While the Magistrate Judge is doubtful that the ALJ's deference to Dr. Crockett's diagnosis would greatly impact the ALJ's decision, it does not necessarily follow that this error is harmless. The Commissioner argues that, because Dr. Crockett offered merely a diagnosis and no limitations, the ALJ did not need to defer to Dr. Crockett's opinion. However, Dr. Crockett's notes reveal Plaintiff's insomnia, anxiety, and poor judgment, among other problems, which may be probative of her ability to work. (Tr. 197-98). As the Sixth Circuit has noted, while the courts must "accord substantial deference to any factual finding by the ALJ," an ALJ who makes no findings on the record with respect to a treating physician is given no deference. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). Because the ALJ has offered no specific reasons on the record for not considering Dr. Crockett's opinions, this action should be remanded for additional

proceedings.[5]

The Magistrate Judge does not believe the ALJ's rejection of Dr. Crockett's opinion is excusable harmless error. In *Blakley*, the Sixth Circuit noted that "harmless error may include the instance where a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, or where the Commissioner has met the goal of the procedural safeguard of reasons." 581 F.3d at 409 (internal quotations omitted). Dr. Crockett's opinion, while offering an additional diagnosis from the consulting physicians and psychiatrists, was not "patently deficient." Moreover, the ALJ's failure to mention Dr. Crockett's opinion at all makes a meaningful review of his decision impossible. *See id*. Merely asserting that "the record does not contain any opinions from treating physicians indicating that the claimant is disabled or even has limitations greater than those determined in the decision" does not, as the Commissioner argues, show compliance with 20 C.F.R. § 404.1527(d)(2). (Tr. 22). The ALJ in this case simply did not comply with the regulation, and this case should be remanded pursuant to 42 U.S.C. § 405(g), sentence four.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **GRANTED in part** and this action be **REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g), sentence four.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any

---

[5] The Magistrate Judge is particularly sensitive to the error in this case, as the ALJ failed to consider one of only three treating sources. While the ALJ likely had reasons for discounting this source, as articulated in the Commissioner's brief, the regulations require those reasons to be articulated in the opinion. *See* 20 C.F.R. § 404.1527(d)(2).

responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 18th day of April, 2011.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge